J. A03007/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BASEM K. SHLEWIET, | : | |
| | : | |
| Appellant | : | No. 1004 EDA 2015 |

Appeal from the Judgment of Sentence February 9, 2015
In the Court of Common Pleas of Bucks County
Criminal Division No(s).: CP-09-CR-0001645-2014
CP-09-CR-0001646-2014

BEFORE: GANTMAN, P.J., MUNDY,J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.: **FILED MARCH 31, 2016**

Appellant, Basem K. Shlewiet, appeals from the judgment of sentence entered in the Court of Common Pleas of Bucks County, following his jury trial convictions for Unlawful Contact with a Minor – Sexual Offenses,[1] Corruption of Minors,[2] seven counts of Indecent Assault by Forcible Compulsion,[3] and seven counts of Indecent Assault Without the Complainant's Consent.[4]  We affirm.

---

[1] 18 Pa.C.S. § 6318(a)(1).

[2] 18 Pa.C.S. § 6301(a)(1)(i).

[3] 18 Pa.C.S. § 3126(a)(2).

[4] 18 Pa.C.S. § 3126(a)(1).

Appellant is a psychiatrist who molested seven of his female patients, including one minor, during treatment sessions. The trial court prepared a detailed and accurate statement of facts and procedural history, which we will incorporate by reference. *See* Trial Ct. Op., dated 6/26/2015, at 1-14.

Appellant raises the following issues on appeal:

a. Was the evidence sufficient to prove beyond a reasonable doubt that the Appellant was guilty of Indecent Assault with respect to the elements of forcible compulsion and/or without the consent of the victims?

b. Was the sentence imposed by the trial court excessive, unreasonable and based upon improper considerations?

Appellant's Brief at 3.

Appellant first challenges the sufficiency of the evidence. Our Supreme Court has set forth the appropriate standard of review: "[w]hen reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Weiss*, 776 A.2d 958, 963 (Pa. 2001) (citation omitted).

We have thoroughly reviewed the certified record, the briefs of the parties, the applicable law, and the well-reasoned Trial Court Opinion. We conclude that Appellant's first issue merits no relief. The comprehensive

Trial Court Opinion properly disposes of the issue and we affirm on the basis of that Opinion. **See** Trial Ct. Op., dated 1/26/15, at 15-27.

Appellant next challenges the discretionary aspects of the sentence imposed by the trial court, which was also the sentencing court. The trial court sentenced Appellant to an aggregate term of 7 to 17 years' incarceration. For one count of Unlawful Contact with a Minor,[5] the trial court sentenced Appellant to a term of 2 ½ to 5 years' incarceration, a sentence in the aggravated range. The trial court also sentenced Appellant to a term of 9 to 24 months' incarceration for each of six counts of Indecent Contact – Forcible Compulsion.[6] The trial court ordered Appellant to serve all sentences consecutive to one another and did not impose a sentence on the remaining counts.

Our standard of review applicable to sentencing challenges is well settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

---

[5] 18 Pa.C.S.A. § 6318(a)(1).

[6] 18 Pa.C.S.A. § 3126(a)(2).

***Commonwealth v. Rodda****,* 723 A.2d 212, 214 (Pa. Super. 1999) (en banc)

(internal quotations and citations omitted).

Appellant does not have an automatic right to appeal the discretionary

aspects of a sentence. Rather, we must first determine whether Appellant

has met the following four elements before we will review the discretionary

aspect of a sentence:

> (1)  whether the appellant has filed a timely notice of appeal;
> (2)  whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence,
> (3)  whether the appellant's brief has a fatal defect, and
> (4)  whether there is a substantial question that the sentence appealed from is inappropriate under the Sentencing Code.

***Commonwealth v. Williams***, 787 A.2d 1085, 1087-88 (Pa. Super. 2001)

(internal citations omitted).

Here, Appellant met the first three elements by filing a timely Notice of

Appeal, properly preserving the issues, and including in his brief a Statement

of Reasons relied upon for allowance of appeal, pursuant to Pa.R.A.P.

2119(f). Accordingly, we next determine whether Appellant's claims present

a "substantial question" for review.

It is well established that a "substantial question" about a sentence is

one in which the trial court violated the sentencing scheme or a fundamental

norm underlying the sentencing process. ***Commonwealth v. Mouzon***, 812

A.2d 617, 627 (Pa. 2002).

Appellant argues that the following issues are "substantial questions" that merit this Court's review of the sentence: (1) the trial court committed a constitutional error when it considered the Appellant's failure to accept responsibility and failure to exhibit remorse as an aggravating factor in determining the sentence to be imposed; (2) the trial court incorrectly considered the victim's age and the fact that there were multiple victims when sentencing for Unlawful Contact with a Minor;[7] and (3) the sentence was excessive and unreasonable. Appellant's Brief at 7-10, 30-36.

We agree that Appellant has raised a "substantial question" and will review the merits of Appellant's claims. *See, e.g., Commonwealth v. Bowen*, 975 A.2d 1120, 1122 (Pa. Super. 2009) (noting a claim that an aggravated-range sentence was based on an unconstitutional factor does raise a "substantial question" for review) and *Commonwealth v. Ferguson*, 893 A.2d 735, 737 (Pa. Super. 2006) (concluding that when trial court actions are inconsistent with the Sentencing Code, there is a "substantial question" for review).

Appellant first states that the trial court "improperly considered the fact that [he] refused to accept responsibility for these crimes" and "it would appear from the statements of the sentencing court that it considered [his] failure to express remorse as an aggravating factor in determining the sentence to be imposed." Appellant's Brief at 30. Although the brief is

---

[7] 18 Pa.C.S. § 6318(a)(1).

inartfully drafted, we deduce from Appellant's case citations that he is averring that such consideration violated his right to remain silent. Appellant's Brief at 30.

We first note that it is **not** an abuse of discretion for the trial court to consider a defendant's lack of remorse as one of many factors used to determine a sentence, "provided that it is specifically considered in relation to protection of the public, the gravity of the offense, and the defendant's rehabilitative needs." *Bowen,* 975 A.2d at 1125.

Appellant, relying on *Bowen,* argues that the trial court impermissibly equated Appellant's silence at sentencing with his failure to take responsibility. *See id.* at 1121.

We disagree with Appellant's analogy. In the instant case, unlike *Bowen,* Appellant allocuted during the sentencing hearing, acknowledging only that the victims had felt uncomfortable during his medical examinations and he should have had someone else in the room. *See* N.T. Sentencing, 2/9/15, at 25-34. After Appellant's allocution, the trial court stated, "there's no doubt in my mind that you haven't accepted responsibility for this. You continue to deny it. Your remorse is for you and your family and not for these young women that you have manipulated and assaulted." *Id.* at 54. In addition, the trial court considered numerous other sentencing factors aside from lack of remorse and lack of responsibility including, but not limited to, the impact on the victims, the types of crimes, the fact that

Appellant exploited his position as a treating psychiatrist, the sentencing guidelines, and the impact on the community. *Id.* at 48-60.

Accordingly, we find that the trial court relied on Appellant's allocution, not Appellant's silence, to determine that Appellant lacked remorse and failed to take responsibility for his crimes. We also find that the trial considered Appellant's lack of remorse and failure to take responsibility, along with a myriad of other sentencing factors, in fashioning an aggravated-range sentence. Therefore, the trial court did not abuse its discretion. *See Bowen*, 975 A.2d at 1221.

Appellant next argues that the trial court engaged in impermissible double counting when it (1) considered the victim's age; and (2) observed that there had been multiple victims, while sentencing for Unlawful Contact with a Minor.[8]

The court considered several factors, including the age of the victim, in sentencing Appellant in the aggravated range:

> [O]n Criminal Information 1645 of 2014, Count Number 1, that's the unlawful contact with a minor – I might add that the sentence in this case is an aggravated sentence because I believe the victim's age is a factor. I don't believe the guidelines ever took into account a doctor-patient relationship, nor do they take into account the multiple victims in the case.

N.T. Sentencing at 59-60. As stated above, the trial court went on to name numerous other sentencing factors. *Id.* at 48-60.

---

[8] 18 Pa.C.S. § 6318(a)(1).

This Court has held that, while it is impermissible for a court to consider factors already included within the sentencing guidelines as the **sole** reason for increasing a sentence to the aggravated range, sentencing courts may consider "other factors already included in the guidelines if, they are used to supplement other extraneous sentencing information." ***Commonwealth v. Simpson***, 829 A.2d 334, 339 (Pa. Super. 2003). Here, as stated above, the trial court considered numerous other sentencing factors and age was **not** the sole factor in fashioning the aggravated sentence. N.T. Sentencing, 2/9/15, at 48-60. We, thus, conclude the court did not abuse its discretion when considering age as one of many factors when sentencing Appellant for Unlawful Contact with a Minor.[9]

Further, it was not an abuse of discretion for the trial court to take into consideration the multiple victims in the case when imposing a sentence for Unlawful Contact with a Minor.[10] Appellant argues that:

> [T]he fact that there were multiple victims in the case should have had no bearing on the sentence to be imposed as to the complainant named in Count 1. As already noted, the lower court did proceed to impose a consecutive term of imprisonment for each of the six other complainants in this case. Therefore, the fact that there were 'multiple victims in the case' was already factored into the lower court's aggregate terms of imprisonment.

Appellant's Brief at 35.

---

[9] 18 Pa.C.S. § 6318(a)(1).
[10] 18 Pa.C.S. § 6318(a)(1).

We disagree. Sentencing a defendant to consecutive sentences for each victim is not tantamount to double counting an aggravating factor where defendant committed a host of crimes with multiple victims. ***Commonwealth v. Dodge***, 77 A.3d 1263, 1277 (Pa. Super. 2013). Therefore, this challenge lacks merit.

Appellant last argues that the sentence was excessive and unreasonable. We have thoroughly reviewed the certified record, the briefs of the parties, the applicable law, and the well-reasoned Trial Court Opinion. The comprehensive Trial Court Opinion properly disposes of this issue, and we affirm on the basis of that Opinion. ***See*** Trial Ct. Op., dated 1/26/15, at 27-32.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/31/2016

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-09-CR-0001645-2014
:
v. :
:
BASEM SHLEWIET :
:

## OPINION

Defendant Basem Shlewiet (hereinafter "Appellant") appeals this Court's February 9,

2015 Judgment of Sentence and March 20, 2015 Denial of Motion to Reconsider Sentence. We

file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

### PROCEDURAL HISTORY

On January 23, 2014, the Bucks County Detectives charged Appellant with multiple

counts of Indecent Assault and related offenses. On October 14, 2014, a jury found Appellant

guilty of Unlawful Contact with a Minor- Sexual Offenses[1], Corruption of Minors[2], seven (7)

counts of Indecent Assault by Forcible Compulsion[3], and seven (7) counts of Indecent Assault

without Complainant's Consent[4], convicting Appellant of all charges with the exception of one

(1) count each of Indecent Assault by Forcible Compulsion and Indecent Assault without

Consent. Sentencing was deferred for a psychiatric evaluation, a pre-sentence investigation, and

an evaluation by the Sexual Offenders Assessment Board.

On January 14, 2015, Appellant filed a Motion for Extraordinary Relief, which this Court

denied at Appellant's Sentencing Hearing on February 9, 2015. At that Hearing, Appellant was

---

[1] 18 Pa.C.S. § 6318(a)(1).
[2] 18 Pa.C.S. § 6301(a)(1)(i).
[3] 18 Pa.C.S. § 3126(a)(2).
[4] 18 Pa.C.S. § 3126(a)(1).

1

sentenced to serve not less than seven (7) years, nor more than seventeen (17) years, in a State Correctional Institution. On February 12, 2015 Appellant filed a Motion for Reconsideration of Sentence, which this Court denied without a hearing on March 30, 2015. On April 9, 2015, Appellant filed a timely Notice of Appeal to Superior Court.

## FACTUAL BACKGROUND

The Commonwealth began its case-in-chief by presenting the testimony of Chelsea Reinert (hereinafter "C.R."). C.R.'s primary physician advised that she see a psychiatrist to help with her anxiety, depression, and an eating disorder, so C.R. began treating with Dr. Shlewiet on October 3, 2013. N.T. 10/07/14, pp. 122-23. C.R. visited Appellant five (5) separate times with her mother present, with each visit occurring approximately two (2) weeks after the previous appointment. N.T. 10/07/14, pp. 125, 137. During her first session, Appellant examined C.R. and prescribed medication to treat her various issues. Appellant did not touch C.R. during this encounter. N.T. 10/07/14, p. 124. At C.R.'s second appointment, Appellant requested that C.R.'s mother leave the room for a period of time. With only him and C.R. in the room, Appellant attempted to measure C.R.'s heart rate using a stethoscope, thereby placing his hand and the stethoscope under her shirt and slightly under her bra, resting upon C.R.'s breast. During this visit, C.R. did not complain of any heart or chest-related pain. N.T. 10/07/14, pp. 125-27.

During C.R.'s third and fourth visits, C.R. experienced similar suggestive contact with Appellant. In each instance, Appellant asked C.R.'s mother to step out of the room and then took C.R.'s heart rate using a stethoscope. Appellant placed his hand and the stethoscope down C.R.'s shirt and underneath her bra. C.R. could feel Appellant's fingertips brushing her nipple and overtop and underneath her breast as well. N.T. 10/07/14, pp. 129-32. During her fourth visit with Appellant, Appellant seemed to act in a more deliberate and slower pace while feeling

2

around C.R.'s chest area. Additionally, Appellant then told C.R. to lie across a loveseat in the room while he felt her stomach overtop of her clothing. N.T. 10/07/14, pp. 132-35. Appellant gave no reason for doing this, and C.R. did not complain of any chest or stomach issues either. Appellant continued to prescribe C.R. medication for her various conditions. N.T. 10/07/14, pp. 135-36.

Appellant's actions during this fourth visit prompted C.R. to tell her parents of his behavior. N.T. 10/07/14, p. 136. After not being able to make an appointment with another psychiatrist within such a small amount of time, C.R. was forced to go back to Appellant so that she could get a re-fill on her prescriptions. During this fifth visit, C.R's mother did not leave the room while she was being examined by Appellant. N.T. 10/07/14, pp. 137, 185-86. With her mother in the room, Appellant still took C.R.'s blood pressure, yet did not reach underneath her shirt or bra to do so. In general, Appellant's behavior was much more "scared, intimidated, and sheepish" than it had been during the previous visits. N.T. 10/07/14, pp. 137-38. At various times during these appointments, C.R. also observed that Appellant would reach down and cup or touch his testicles as he was talking and listening to her. N.T. 10/07/14, pp. 141-42.

Throughout this time, C.R. kept seeing Appellant as she needed to continue to receive medication to treat her various conditions. Even though C.R. did not believe the medication was working, she still felt as if she needed to continue treatment with the hope that she could find a medication that would help. N.T. 10/07/14, p. 128.

Jenna Miniscalco (hereinafter "J.M.") began treating with Appellant in July 2013 for her anxiety and depression. N.T. 10/07/14, pp. 202-03. During J.M.'s first two (2) visits to Appellant's Doylestown office, Appellant treated J.M. and prescribed her medicine to address both her anxiety and depression, and prescribed new medication for a suspected case of ADD.

3

N.T. 10/07/14, pp. 204-06. After going away to college, J.M. began FaceTiming with Appellant so that he could monitor her condition and the effects of the prescribed medication. At the behest of J.M.'s parents, J.M. went to a family therapy session that involved her parents, Appellant, and J.M.'s therapist as well. N.T. 10/07/14, pp. 207-09. Throughout these encounters with Appellant, Appellant did not touch J.M. in any suggestive way or attempt to measure her heart rate.

J.M. further visited Appellant on January 8, 2014, while on winter break from college. N.T. 10/07/14, p. 209. During this visit, however, Appellant insisted on monitoring J.M.'s heart rate and requested that she remove her sweatshirt so that he could better do so. Appellant then proceeded to place his hand and his stethoscope down her camisole and underneath her bra, touching in between and on both of her breasts. J.M. confirms that his hand reached down to the underwire of the bra. N.T. 10/07/14, pp. 209-11. Appellant then told J.M. that she had high blood pressure, instructed her to stop talking, and then he sat across from her with his eyes closed for approximately one minute. After that time elapsed, Appellant told J.M. that she had white coat syndrome and was afraid of him, and he proceeded to measure her heart rate again. He touched J.M. in the same fashion as he had previously, again reaching underneath her shirt and bra and touching both of her breasts. N.T. 10/07/14, pp. 212-13.

J.M. did not feel comfortable with Appellant's behavior and was also disturbed by the thought of having high blood pressure. J.M. prepared to go back to Appellant two (2) weeks later as she needed a re-fill of her medication and did not believe that she could get an appointment with another psychiatrist in such a small amount of time. N.T. 10/07/14, p. 214. When J.M. attempted to go to her next appointment, she intentionally wore a larger, baggy t-shirt underneath her sweatshirt so that Appellant would not have enough room to go down the top of her shirt and

4

would have plenty of room to use her arm instead. J.M. did not have this appointment with Appellant, however, as Appellant was arrested the previous day. N.T. 10/07/14, pp. 214-15.

In January 2013, Brittany Kulick (hereinafter B.K.) started visiting Appellant in order to treat her depression, anxiety, and other related issues. N.T. 10/08/14, p. 14. During her first two appointments with Appellant, he did not touch her inappropriately, only placing the stethoscope slightly under her shirt in order to take her blood pressure. 10/08/14, pp. 16-18. However, Appellant's behavior changed during B.K.'s subsequent visits. At her third appointment with Appellant, Appellant proceeded to reach deeper into B.K.'s shirt and underneath her bra while attempting to measure her heart rate. B.K. could feel Appellant's hand touching her breasts and nipples and, at times, could feel him cup her breasts while underneath her bra as well. B.K. did not complain about chest pains during this visit. N.T. 10/08/14, pp. 18-20.

After that third appointment, B.K. continued to visit Appellant for treatment. In response to B.K.'s complaints about nausea, Appellant switched her medication at a previous appointment. During a subsequent February visit, B.K. confirmed that she was no longer experiencing nausea from her new medication. Despite B.K.'s claims, Appellant insisted on examining B.K.'s stomach and reached his hand down below her underwear line. N.T. 10/08/14, pp. 21-23.

During B.K.'s next two appointments, Appellant's inappropriate behavior escalated. At B.K.'s next visit, which occurred during late February 2013, Appellant attempted to take her blood pressure and felt both of her breasts underneath her bra as he did during previous visits. However, B.K. wore a nipple ring during this appointment, and she could feel Appellant feel around and touch the ring. In addition, Appellant commented on the ring during that appointment in a way that indicated to B.K. that he was also looking down her shirt. After that incident,

5

Appellant began to generally behave and talk in a way that made B.K. feel more uncomfortable around him than she had previously. N.T. 10/08/14, pp. 23-24.

B.K. visited Appellant once more before she contacted the police. At this appointment, Appellant informed B.K. that she had low blood pressure and that she should lie down on the couch in his office. B.K. was wearing a long skirt at the time, and Appellant instructed B.K. to uncross her legs and place them up over the arm of the couch. N.T. 10/08/14, pp. 26-27. Appellant then crouched on the side of the couch, placing one hand on B.K.'s inner upper thigh and the other hand grabbing her breasts inside of her shirt. B.K. did not look at Appellant as she thought that he would kiss her if she turned her head. Appellant kept telling B.K. to "relax." Appellant continually asked, "What can we do to make you relax?," suggesting that she smoke a cigarette or do yoga. Then Appellant pressed further, saying, "You can't think of anything else I can do to make you relax? What can we do to make you relax? What can we do to make you relax?" Appellant's behavior scared B.K., and it seemed as if he was getting satisfaction from hearing B.K.'s heart during this encounter. The appointment lasted for approximately twenty (20) minutes, and apart from the very start of the session, B.K. was lying on the couch for its entirety. N.T. 10/08/14, pp. 28-30.

After this last appointment, B.K. went to the Doylestown Borough Police to report Appellant. N.T. 10/08/14, p. 31. While the investigation was ongoing, B.K. received prescriptions for her medicine from her family doctor. After two (2) months, however, B.K.'s family doctor could no longer prescribe the medication, and B.K. was forced to go back to Appellant for her prescriptions. B.K. returned to Appellant's office for three (3) more visits after she had contacted the police, and she would wrap medical bandages around her breasts before attending her appointments. N.T. 10/08/14, pp. 38-40. During these last few appointments,

6

Appellant behaved differently toward B.K. and did not touch her as he had in prior visits. N.T. 10/08/14, p. 41.

Samantha Welsh (hereinafter "S.W.") began seeing Appellant to assist in her recovery from an opiates addiction and to treat her anxiety and depression. N.T. 10/08/14, pp. 84-85. S.W. visited with Appellant several times between May 27, 2013 and January 17, 2014. Appellant did not touch S.W. during her first scheduled appointment. However, Appellant proceeded to have inappropriate physical contact with S.W. approximately (10) times during her treatments with him. Beginning with her appointment on May 28, 2013, Appellant began to touch S.W.'s left breast and nipple underneath her shirt and bra while claiming to monitor her heart rate.

During the summer months, S.W. changed the way she was dressing in an attempt to prevent Appellant from touching her breasts. S.W. would wear multiple layers and even put on a long sleeve shirt that she kept in her car before going in for her appointments. Yet the wardrobe changes did not affect Appellant's behavior. N.T. 10/08/14, p. 102. In an appointment during July or August of 2013, Appellant proceeded to touch both of S.W.'s breasts while using a stethoscope to seemingly monitor her heart rate. Appellant touched S.W. under the pretense that he was also checking her lungs as well. N.T. 10/08/14, pp. 99-100. During this appointment, Appellant continued to prescribe S.W. medications for her various issues, including Suboxone and Prozac. N.T. 10/08/14, p. 101.

Appellant's behavior remained unchanged until an October 3, 2013 appointment. During this visit, Appellant began by feeling S.W.'s breast while attempting to monitor her heart rate, except S.W. noted that Appellant felt her by placing his hand up from the bottom of her shirt. N.T. 10/08/14, pp. 106-07. Appellant then told S.W. that her heart seemed to be beating fast and instructed her to lie down on the couch in his office. Appellant then touched S.W.'s stomach,

7

asking if anything was tender or hurt at all. Despite S.W. affirming that she was not feeling any pain, Appellant continued to touch S.W. Appellant then knelt next to the couch and ran his right hand down S.W.'s pants, placing it partway beneath S.W.'s underwear line. At this point, S.W. grabbed Appellant's hand, prompting Appellant to pull his hand back away from S.W. Appellant gave S.W. her prescriptions and the appointment ended. N.T. 10/08/14, pp. 103-05.

Appellant's inappropriate behavior continued throughout S.W.'s remaining visits. In a November appointment, Appellant felt both of S.W.'s breasts again, yet this time, S.W. observed that Appellant flicked or touched her left nipple in what seemed to be an attempt to stimulate it. N.T. 10/08/14, p. 108. At her next appointment, Appellant immediately instructed S.W. to lie down on the couch. Appellant reached his hand up from the bottom of S.W.'s shirt and felt her left breast underneath her bra. After doing so, Appellant informed S.W. that "something was going on" with her heart, and he gave her a form to get an EKG test. S.W. later received the EKG test, which revealed no problems with her heart. N.T. 10/08/14, pp. 109-10.

S.W. next saw Appellant on January 8, 2014 for a scheduled appointment. During this visit, Appellant questioned S.W. about her marriage and further divulged that his marriage was not going well, and he had no sex life with his wife. Appellant then communicated to S.W. that the two should "help each other out," an advance which S.W. declined. N.T. 10/08/14, pp. 110-11. S.W. next paid an unscheduled visit to Appellant in his office on January 13, 2014, as she was not feeling right, explaining that she was feeling what seemed to be electric shocks going through her head. Appellant told her to wait a few days, and S.W. left without any physical contact with Appellant. N.T. 10/08/14, pp. 112-13.

S.W.'s last visit with Appellant occurred on January 17, 2014. S.W.'s condition was getting worse, so she again stopped by Appellant's office for an unscheduled visit. S.W. had a

8

friend drive her, and her friend accompanied her inside the office as well. Appellant saw S.W., and further agreed to change her medication as well. Afterwards, Appellant asked S.W.'s friend to step out of the office, whereupon he then grabbed the back of S.W.'s head, pulled her into his face, and proceeded "to shove his tongue halfway down [her] throat." S.W. pulled herself away and informed Appellant that "this will be the last time you ever touch me like this again." N.T. 10/08/14, pp. 113-14.

S.W. did not see Appellant again for treatment after the January 17, 2014 visit. Despite Appellant's inappropriate touching during the length of S.W.'s treatment, S.W. continued to treat with Appellant as she felt that she did not have a choice. N.T. 10/08/14, p. 115. Moreover, S.W. conducted research on the Suboxone website, which indicated that Appellant and a Quakertown clinic were the only two available medical offices in the area that could prescribe Suboxone. N.T. 10/08/14, pp. 94-95. S.W. looked into making an appointment with the Quakertown clinic, but a $70 walk-in fee without the guarantee of an appointment prevented S.W. from attempting to treat there. So S.W. kept seeing Appellant in order to continue with her Suboxone treatment. N.T. 10/08/14, p. 117-18.

Annie Axenroth (hereinafter "A.A.") saw Appellant from August 2012 until November 2013 to treat her anxiety and related issues. N.T. 10/08/14, p. 167. During this period, A.A. was 16-17 years old. N.T. 10/08/14, p. 170. Before her November 2013 appointment, A.A. visited Appellant approximately every 4-6 weeks in his office for treatment and to receive her prescriptions. During these visits, Appellant would take A.A.'s blood pressure by pumping up a cuff around her arm and placing his stethoscope under the cuff. N.T. 10/08/14, pp. 168-69.

During A.A.'s November appointment, Appellant's behavior changed. Appellant began by taking A.A.'s blood pressure as he usually did, except he then told her that it seemed higher than

9

usual. Appellant instructed A.A. to lie down on the couch to see if she would be more relaxed. N.T. 10/08/14, p. 170. While she was lying down, Appellant put his hand underneath A.A.'s shirt with his stethoscope. After he finished touching underneath her shirt, he began to massage her stomach, asking if it hurt when he touched certain places, even though A.A. never complained to him about any stomach issues. As he was touching her stomach, Appellant questioned A.A. about her sex life, asking if it ever hurt when she had sex. Afterwards, Appellant then placed his hand under A.A.'s pants, ultimately stopping a few inches below the pant line. Appellant further instructed A.A. to turn over so that she would be lying on her stomach, and he then proceeded to touch in between her legs and to the front of her body. A.A. could feel Appellant touching her vagina on the outside of her leggings. N.T. 10/08/14, pp. 170-73. After Appellant finished touching her, Appellant told A.A. to sit up on the couch. As she sat up, Appellant stood directly in front of her such that his zipper was in line with A.A.'s face. When A.A. left Appellant's office, she texted her mom "Think I was almost raped by Dr. Shlewiet." See Exhibit C-2; N.T. 10/08/14, pp. 174-77.

Beginning in the last week of August 2013, Samantha Hagan (hereinafter "S.H.") saw Appellant a total of four (4) times. S.H. was transferring from another psychiatrist and sought out Appellant to help treat her anxiety, depression, and other related issues. N.T. 10/08/14, pp. 197-98. During the first visit to his office, Appellant took S.H.'s blood pressure by pumping up a cuff around her arm and using his stethoscope. Appellant sat next to S.H., then proceeded to remove the stethoscope from her arm and place it down the left side of her shirt, ultimately placing his hand and the stethoscope underneath her shirt and bra, touching her left breast and nipple. S.H. could feel Appellant's hands actually touching both her breast and nipple. N.T. 10/08/14, pp.

10

199-200. At the conclusion of her appointment, Appellant prescribed S.H. medication for her anxiety and depression. N.T. 10/08/14, p. 201.

At S.H.'s second appointment, Appellant measured S.H.'s heart rate twice. Appellant asked S.H. to lie down on the couch, then he positioned her legs so that they were dangling over the arm. N.T. 10/08/14, pp. 201-03. Appellant proceeded to reach his hand and stethoscope up from the bottom of S.H.'s shirt and placed it inside her bra. S.H. could again feel Appellant touching her left breast and nipple with his hand. N.T. 10/08/14, pp. 203-05. After Appellant finished touching S.H., he went to his desk and asked S.H. some questions as she resumed her seated position. Appellant then seemed as if he were thinking about something, and then told S.H. to lie down on the couch again. Appellant then repeated what he had done moments before, feeling S.H.'s left breast underneath her shirt as he attempted to monitor her heart rate. N.T. 10/08/14, pp. 205-06.

S.H. returned to Appellant's office after her second visit so that she could re-fill her medication. During this third appointment, Appellant did not touch S.H. inappropriately. N.T. 10/08/14, p. 206. S.H. returned for a fourth and final visit, but asked her boyfriend to accompany her, hoping that his presence would dissuade Appellant from touching her as he had previously. At this appointment, S.H. remembers Appellant checking her blood pressure, but not touching her inappropriately. However, before S.H. left his office, Appellant asked S.H. if she had any questions about everything that "stays in here," which seemed to S.H. to be an attempt by Appellant to control what she would say outside of his office. N.T. 10/08/14, pp. 207-08, 211.

Chelsea Kalman (hereinafter "C.K.") visited Appellant from August 2013 until December 2013 to treat for anxiety disorder and related issues. N.T. 10/09/14, p. 14. During her first appointment in August, Appellant did a routine examination of C.K., including checking her

11

blood pressure. However, Appellant used an inflatable arm cuff and placed his stethoscope near the cuff in order to measure C.K.'s blood pressure. Appellant proceeded to prescribe C.K. medication before the appointment concluded. N.T. 10/09/14, pp. 16-17.

After her first appointment, C.K. visited Appellant monthly until December 2013. Appellant did not attempt to take C.K.'s blood pressure during any of the next three visits, and C.K. did not complain of any issues with her heart or chest either. N.T. 10/09/14, pp. 17-20.

During C.K.'s final visit in December, however, Appellant's behavior changed. Appellant informed C.K. that he was thinking about placing her on a new medication, and that he would need to take her blood pressure. Right away, Appellant placed his hand and stethoscope down C.K.'s shirt and underneath her bra. Appellant's hand reached down to the bottom of C.K.'s bra, and C.K. could feel his fingers on her breast and nipple. N.T. 10/09/14, pp. 21-22. Appellant then informed C.K. that he couldn't read her heart rate, so he told her to lie down on the couch. As C.K. laid on the couch with her legs hanging over the arm, Appellant proceeded to put his stethoscope back down C.K.'s shirt and beneath her bra as he did before. C.K. could again feel Appellant's whole hand on her breast. N.T. 10/09/14, pp. 23-25.

In July 2013, Devon Jones (hereinafter "D.J.") began seeing Appellant to treat issues associated with both heroin addiction and the recent death of her sister as a result of her own heroin addiction. N.T. 10/09/14, pp. 53-54. During her first three (3) visits, D.J. was accompanied to Appellant's office with her mother, and Appellant did not touch D.J. inappropriately. Appellant treated D.J. and provided her with medication at each appointment. N.T. 10/09/14, pp. 54-58.

On August 22, 2013, D.J.'s mother was on vacation, so D.J. went to her fourth appointment alone. At his office, Appellant initially commented on D.J.'s improved physical

12

appearance, as she had now been off heroin for some time. However, Appellant began to make D.J. feel uncomfortable with how he was stressing that she was "hot" and continually insisting that she take off her jacket. N.T. 10/09/14, pp. 58-59. After that exchange, Appellant told D.J. to lie down on the couch. As D.J. did so, Appellant proceeded to pull down the top of the strapless summer dress that D.J. was then wearing, exposing both of her breasts. Appellant then checked D.J.'s heart beat for approximately three (3) seconds, then began pressing on and grasping her breast, giving her what seemed like a physical examination. Appellant stopped touching D.J. after approximately ten-fifteen (10-15) seconds and prescribed her medication before she left the office. N.T. 10/09/14, pp. 60-64.

Prior to her next appointment, D.J. left her parents' house and moved in with an old boyfriend with whom she used to use heroin. Shortly after leaving home, D.J. ran out of medication and relapsed on her heroin addiction. N.T. 10/09/14, pp. 65-66. Approximately four (4) days before Halloween, D.J.'s parents removed her from her boyfriend's house and brought her back to their home to help her through the detoxification process. On November 1, 2013, five (5) days after D.J.'s parents brought her home, D.J. and her mother went to see Appellant. N.T. 10/09/14, pp. 67-70.

During the ensuing appointment, D.J.'s mother entered Appellant's office with her and told Appellant what had happened. Appellant then told D.J.'s mother to leave the room, and afterwards D.J. discussed the recent developments with Appellant. Appellant then told D.J. to lie down so that he could check her heart rate. Appellant proceeded to lift up D.J.'s shirt over her breasts and pull her bra down so her breasts were exposed. Appellant initially used a stethoscope, but then began to fondle D.J.'s left breast as he had done during her previous visit. N.T. 10/09/14, pp. 70-72. Appellant did not prescribe any medication for D.J. during this appointment, but

13

rather suggested that she visit a rehabilitation facility. Immediately after leaving Appellant's office, D.J. told her mom of Appellant's behavior, but her mother insisted that they just concentrate on getting her into rehab as soon as possible. N.T. 10/09/14, pp. 72-73.

Ashley Bartasek's (hereinafter "A.B.") nine (9) year-old son, Robert, saw Appellant for approximately two (2) years to treat his Asperger Syndrome and ADHD. N.T. 10/09/14, pp. 154-55. Robert visited Appellant once per month for twenty-four (24) months, making for a total of twenty-four (24) visits. A.B. accompanied her son for each appointment, and not once did Appellant ask her to leave the room. Additionally, Appellant never measured her son's heart rate. N.T. 10/09/14, pp. 154-57.

At her son's last appointment, A.B. scheduled her own appointment with Appellant to address her recent depression and anxiety. At the beginning of her appointment, Appellant took A.B.'s heart rate by placing an inflatable cuff on her arm and further placing his stethoscope inside her shirt at the top of her breast. N.T. 10/09/14, pp. 158-60. Afterwards, Appellant had a discussion with A.B., asking several inappropriate questions. Appellant inquired of A.B. if she masturbates, what stimulates her, if she watches porn, and other related questions. A.B. never talked to Appellant about relationship problems that she was having at the time. N.T. 10/09/14, p. 161-62. Despite only being scheduled for a forty (40) minute appointment, A.B.'s visit lasted for between two (2) and two-and-a-half (2 1/2) hours, most of which was spent discussing sex or sexual things. N.T. 10/09/14, pp. 163-64.

Based upon the above evidence, the jury returned a guilty verdict on the charges of Unlawful Contact with a Minor, Corruption of Minors, seven (7) counts of Indecent Assault by Forcible Compulsion, and seven (7) counts of Indecent Assault without Consent. The jury found

14

Appellant not guilty of one (1) count each of Indecent Assault by Forcible Compulsion and Indecent Assault without Consent.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

On April 10, 2015, this Court issued a 1925(b) Order directing Appellant to file a Concise Statement of Matters Complained of on Appeal within twenty-one days. Appellant filed such a Statement on April 30, 2015, which raised the following issues, *verbatim*:

1.    The Commonwealth presented evidence that was not sufficient to prove beyond a reasonable doubt that the Defendant was guilty of these multiple charges of Indecent Assault with respect to the proof of the element of his intent to gain sexual gratification. This deficiency undermines his convictions for violating 18 Pa.C.S. §3126(a)(1) and (a)(2) as well as §6301 and §6318.

2.    The Commonwealth presented evidence that was not sufficient to prove beyond a reasonable doubt that the Defendant was guilty of these multiple charges of indecent Assault with respect to the proof of the element that the Defendant acted with force or that he acted without the consent of the victims. This deficiency undermines his convictions for violating 18 Pa.C.S. §3126(a)(1) and (a)(2) as well as §6301 and §6318.

 (a)    In support of points 1 and 2, the Appellant attaches hereto a true and correct copy of his Motion for Extraordinary Relief/Judgment of Acquittal for All Charges filed in this Court on January 12, 2015.[5]

3.    The sentenced (sic) imposed by the trial court was excessive, unreasonable and outside the sentencing guidelines, as set forth in his post sentence motion for reconsideration of sentence. In support of this point, the Appellant attaches a true and correct copy of his Motion for Reconsideration filed in this Court on February 13, 2015.[6]

## ANALYSIS

### I.    Sufficiency of the Evidence

Appellant contends that the evidence presented at trial was not sufficient to sustain the jury's verdict. We demonstrate herein that the Commonwealth presented sufficient evidence to

---

[5] Appellant filed a Motion for Extraordinary Relief/Judgment of Acquittal for All Charges with this Court on January 14, 2015, and the Motion was denied at Appellant's Sentencing Hearing on February 9, 2015.
[6] Appellant filed a Motion for Reconsideration of Sentence with this Court on February 12, 2015, and the Motion was denied by Order dated March 20, 2015.

the jury to prove beyond a reasonable doubt that Appellant committed the crimes of which he was convicted.

The Pennsylvania Supreme Court has articulated that the well-settled standard of review in judging the sufficiency of the evidence is whether, when viewing the evidence in a light most favorable to the Commonwealth as the verdict winner and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime were established beyond a reasonable doubt. Commonwealth v. Hagan, 654 A.2d 541, 543 (Pa. 1995); Commonwealth v. Heberling, 678 A.2d 794, 795 (Pa. Super. 1996). The Superior Court has elaborated:

> In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Ventrini, 734 A.2d 404, 406-07 (Pa. Super. 1999) (citations omitted). "Furthermore, it is well-established that even the uncorroborated testimony of the complaining witness is sufficient to convict a defendant of sexual offenses." Commonwealth v. Bishop, 742 A.2d 178, 189 (Pa. Super. 1999).

Clearly, in finding Appellant guilty of Unlawful Contact with a Minor, Corruption of Minors, seven (7) counts of Indecent Assault by Forcible Compulsion, and seven (7) counts of Indecent Assault without Consent, the jury believed the testimony of the Commonwealth's

16

witnesses and accepted the Commonwealth's evidence to the extent it established beyond a reasonable doubt the elements of these offenses. Based on the foregoing facts and in viewing the facts most favorable to the Commonwealth as verdict winner, it is apparent that the Commonwealth presented sufficient evidence to the jury to prove beyond a reasonable doubt that Appellant committed the offenses.

### A. Indecent Assault Without Complainant's Consent

A person is guilty of Indecent Assault Without Complainant's Consent if he "has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant," and he does so "without the complainant's consent." 18 Pa.C.S. § 3126(a)(1). Indecent contact is "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S. § 3101. In order to find that a person initiates contact for the purpose of gratifying sexual desire, direct evidence is unnecessary, and such a purpose may be inferred based on the evidence presented. See G.V. v. Dep't of Pub. Welfare, 52 A.3d 434, 439 (Pa. Commw. Ct. 2012) rev'd on other grounds, 91 A.3d 667 (Pa. 2014). Moreover, the phrase "other intimate parts" is not limited solely to genitalia. Commonwealth v. Capo, 727 A.2d 1126, 1127 (Pa. Super. 1999).[7]

The evidence in the light most favorable to the Commonwealth was sufficient to support the jury's finding that indecent contact occurred between Appellant and C.R. The jury heard the

---

[7] "The language of the statutory section defining indecent contact includes both "sexual" and "other intimate parts" as possible erogenous zones for purposes of prosecution. Therefore, the phrase "other intimate parts" cannot refer solely to genitalia, as such a construction ignores the distinction between "sexual" and "other intimate parts," making the latter term redundant." Capo, 727 A.2d at 1127.

testimony of C.R. in which she detailed Appellant touching her breasts as he claimed to monitor her heart rate on three (3) separate occasions. During C.R.'s second appointment with Appellant, Appellant placed his stethoscope under C.R.'s shirt and slightly beneath her bra, resting it upon her breast. N.T. 10/07/14, pp. 125-27. At her third appointment, Appellant placed his hand and his stethoscope beneath C.R.'s shirt and bra, with C.R. being able to feel Appellant's fingertips against both her breast and nipple. N.T. 10/07/14, pp. 129-32. During C.R.'s next visit, Appellant touched her breast and nipple in the same manner as before, except he did so in a slower, more deliberate manner. Appellant also made C.R. lie down on a couch in the office and felt her stomach overtop of her clothing, giving no medical reason for doing so. N.T. 10/07/14, pp. 132-36. Based on the above evidence and the fact that Appellant touched C.R. in a manner that his own expert deemed was unnecessary to monitor a patient's heart rate, the jury could properly infer that Appellant contacted C.R. for the purpose of his own sexual gratification. N.T. 10/09/14, pp. 44-48. The foregoing evidence was sufficient to find that Appellant indecently contacted C.R.

There was likewise sufficient evidence to establish that C.R. did not consent to such contact. C.R. testified that she felt like what Appellant was doing was wrong, and she was not comfortable with his behavior. N.T. 10/07/14, pp. 131-32. Moreover, C.R. informed her parents of Appellant's actions and had her mother accompany her while in his office for her final appointment. N.T. 10/07/14, pp. 136-37. C.R. only continued to return to Appellant's office because she needed help with her medication. N.T. 10/07/14, p. 132. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that C.R. did not consent to the indecent contact initiated by Appellant.

18

The evidence presented was equally sufficient for the jury to find that indecent contact occurred between Appellant and J.M. J.M. testified that at a January 2014 appointment, Appellant touched her breasts as he attempted to measure her heart rate. Appellant reached his hand and stethoscope down J.M.'s camisole and underneath her bra, such that his hand touched both of her breasts as well as in between her breasts. N.T. 10/07/14, pp. 209-11. J.M. confirmed that after Appellant touched her, he attempted to measure her heart rate again during that same appointment. Appellant then touched J.M.'s breasts in the same manner as he did moments prior. N.T. 10/07/14, pp. 212-13. Based on the above evidence and the seemingly unnecessary and repetitive nature of Appellant's contact with J.M., the jury could properly infer that Appellant contacted J.M. for the purpose of his own sexual gratification. The foregoing evidence was sufficient to find that Appellant indecently contacted J.M.

There was sufficient evidence for the jury to further find that J.M. did not consent to this indecent contact. J.M. testified that she was confused and not comfortable with Appellant touching her breasts. N.T. 10/07/14, p. 213-14. After the appointment in which Appellant indecently contacted her, J.M. intentionally wore a baggier t-shirt that would give Appellant ample room to take her blood pressure using her arm instead of going down the top of her shirt. J.M. further testified that she only returned to Appellant's office because she needed her medication and did not have enough time to procure an appointment with another psychiatrist. N.T. 10/07/14, pp. 214-15. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that J.M. did not consent to the indecent contact initiated by Appellant.

The record further indicates that indecent contact occurred between Appellant and B.K. B.K. testified that during several appointments with Appellant, Appellant would attempt to

19

monitor her heart rate by reaching his hand and stethoscope underneath her shirt and bra. Appellant first did so at B.K.'s third appointment, where B.K. could feel Appellant touching her breasts and nipples, and at times, she could feel him cup her breasts in his hand. During this visit, B.K. also testified that Appellant insisted on examining her stomach by reaching his hand down beneath her underwear line. N.T. 10/08/14, pp. 18-20.

B.K. also told the jury that at her next two (2) appointments, Appellant continued to feel her breasts as he did previously. The next time he touched B.K., B.K. recalls him feeling her nipple ring with his fingers and commenting about it to her. N.T. 10/08/14, pp. 23-24. During her final appointment, not only did Appellant feel her breasts while claiming to monitor her heart rate, but he made her lie down on a couch while he touched her. Specifically, B.K. testified that Appellant made her lie on the couch and uncross her legs as he crouched next to her, using one arm to rub between her thighs while the other grabbed her breasts underneath her shirt. While touching her, Appellant continually asked B.K. what else he could "do to make [her] relax." N.T. 10/08/14, pp. 26-30. Based on the Appellant's specific actions, his sexually suggestive comments, and the fact that Appellant touched B.K. in a manner that his own expert deemed was unnecessary to monitor a patient's heart rate, the jury could properly infer that Appellant contacted B.K. for the purpose of his own sexual gratification. N.T. 10/09/14, pp. 44-48. The foregoing evidence was sufficient to find that Appellant indecently contacted B.K.

The evidence was sufficient for the jury to find that B.K. did not consent to this indecent contact. B.K. described Appellant's touching her breasts as "inappropriate." N.T. 10/08/14, pp. 19-20. B.K. further recalled that Appellant's behavior left her feeling very uncomfortable and scared. N.T. 10/08/14, pp. 28-30. B.K. only returned to Appellant's office after the inappropriate contact because she needed her prescriptions re-filled, yet before she arrived at his office, she

20

first wrapped a medical bandage around her breasts in the hope of preventing him from indecently contacting her further. N.T. 10/08/14, pp. 39-40. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that B.K. did not consent to the indecent contact initiated by Appellant.

S.W.'s testimony likewise supports the finding that indecent contact occurred between her and Appellant. S.W. testified that while treating with Appellant, he touched her breasts approximately ten (10) separate times. Beginning with her May 2013 appointment, Appellant touched S.W.'s left breast and nipple beneath her bra while claiming to monitor her heart rate. Appellant continued to touch S.W.'s breasts underneath her shirt and bra during her appointments until January 2014. Appellant would only touch the left breast at some appointments, while he would touch both during other visits. N.T. 10/08/14, pp. 92, 97-101, 106-10. During an appointment on January 8, 2014, Appellant insisted on explaining his lack of a sex life to S.W., immediately after which he further offered that the two of them could "help each other out." N.T. 10/08/14, p. 111. During an unscheduled visit approximately one week later, while alone in his office with S.W., Appellant grabbed her head, pulled her into face, and proceeded "to shove his tongue halfway down [her] throat." N.T. 10/08/14, p. 113. Based on the specific actions that Appellant took towards S.W., coupled with the sexually charged and suggestive comments that he made, the jury could properly infer that Appellant contacted S.W. for the purpose of his own sexual gratification. The foregoing evidence was sufficient to find that Appellant indecently contacted S.W.

The evidence was sufficient for the jury to further find that S.W. did not consent to this indecent contact with Appellant. S.W. testified that Appellant's touching her made her feel uncomfortable, and she only kept returning to his office so that she could continue to receive her

21

prescription medications. N.T. 10/08/14, p. 93. At one appointment, S.W. grabbed Appellant's wrist as he began to reach his hand down into her underwear line. At another, S.W. admonished Appellant after he had attempted to shove his tongue down her throat, saying, "This will be the last time you ever touch me like this." N.T. 10/08/14, pp. 105-06, 113-14. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that S.W. did not consent to the indecent contact initiated by Appellant.

The evidence was also sufficient for the jury to find that indecent contact occurred between Appellant and S.H. S.H. testified that Appellant touched her breasts at two (2) separate appointments. During her first visit, Appellant sat next to her on the couch and placed his hand and stethoscope down the left side of her shirt and underneath her bra. S.H. could feel Appellant's hand touching her breast and nipple. N.T. 10/08/14, pp. 199-200. At her second appointment, Appellant told S.H. to lie down on his couch and positioned her legs over the side of the arm. He then proceeded to reach his hand and stethoscope up from the bottom of her shirt and underneath her bra. Again, S.H. could feel Appellant touching her breast and nipple with his hand. N.T. 10/08/14, pp. 203-05. Later during that same appointment, Appellant again told S.H. to lie back down on the couch, and he then proceeded to feel her left breast as he did before. N.T. 10/08/14, pp. 205-06. Based on the above evidence and the fact that Appellant's repeated contact with S.H.'s nipple was medically unnecessary to monitor a patient's heart rate, the jury could properly infer that Appellant contacted S.H. for the purpose of his own sexual gratification. N.T. 10/09/14, pp. 44-48. The foregoing evidence was sufficient to find that Appellant indecently contacted S.H.

The evidence was sufficient for the jury to find that S.H. did not consent to this indecent contact. S.H. testified that she was uncomfortable with Appellant's behavior. S.H. further

22

recalled that she asked her therapist and several members of her family to accompany her to an appointment at Appellant's office with the hope that he would not touch her with someone else present. N.T. 10/08/14, p. 208. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that S.H. did not consent to the indecent contact initiated by Appellant.

The evidence is likewise sufficient to support the finding that indecent contact occurred between Appellant and D.J. D.J. testified that at an appointment with Appellant, Appellant told her to lie down on a couch, and then pulled down the top of her strapless dress, exposing her breasts. After briefly seeming to check her heart beat, Appellant began to press on and grasp D.J.'s breasts. N.T. 10/09/14, pp. 60-64. During her next visit, Appellant again told D.J. to lie down, whereupon he lifted her shirt up over her breasts and pulled her bra down so her breasts were exposed. After initially using his stethoscope, Appellant began to fondle D.J.'s left breast as he had done during the previous visit. Based on the above evidence and the fact that Appellant's touching and exposing of D.J.'s intimate body parts was seemingly unnecessary to monitor her heart rate, the jury could properly infer that Appellant contacted D.J. for the purpose of his own sexual gratification. The foregoing evidence was sufficient to find that Appellant indecently contacted D.J.

Moreover, the evidence was sufficient to find that D.J. did not consent to this indecent contact initiated by Appellant. D.J. testified that she was very uncomfortable with Appellant feeling her breasts and was in shock by his behavior. N.T. 10/09/14, p. 61. D.J. told her mom directly after one appointment that Appellant had felt her breasts, and that "this isn't right." N.T. 10/09/14, p. 73. Taken in light most favorable to the Commonwealth, this evidence was

23

sufficient for the jury to find that D.J. did not consent to the indecent contact initiated by Appellant.

Lastly, the evidence viewed in light most favorable to the Commonwealth was sufficient to find that indecent contact occurred between Appellant and A.A. The jury heard testimony that Appellant made A.A. lie down, and then reached underneath her shirt with his stethoscope. A.A. further testified that Appellant touched in between her legs such that she could feel his hand touching her vagina over top of her leggings. N.T. 10/08/14, pp. 170-73. Based on the above evidence and the fact that Appellant's touching of A.A.'s breasts and vagina was unnecessary to monitor her heart rate, the jury could properly infer that Appellant contacted A.A. for the purpose of his own sexual gratification. The foregoing evidence was sufficient to find that Appellant indecently contacted A.A.

The evidence was sufficient for the jury to further find that A.A. did not consent to this indecent contact. A.A. testified that after her appointment where Appellant indecently contacted her, she immediately sent a text to her mother, saying "Think I was almost raped by Dr. Shlewiet." A.A. spoke with her parents following the appointment and went to the Doylestown Police Department soon after. N.T. 10/08/14, pp. 175-78. Taken in light most favorable to the Commonwealth, this evidence was sufficient for the jury to find that A.A. did not consent to the indecent contact initiated by Appellant.

**B. Indecent Assault By Forcible Compulsion**

A person is guilty of Indecent Assault By Forcible Compulsion if he "has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for

24

the purpose of arousing sexual desire in the person or the complainant," and he does so "by forcible compulsion." 18 Pa.C.S. § 3126(a)(2).

Forcible compulsion is "compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101. Forcible compulsion "connotes the act of using superior force—physical, moral[,] psychological, or intellectual—to compel a person to do a thing against that person's volition and/or will." Commonwealth v. Rhodes, 510 A.2d 1217, 1225 (Pa. 1986). "The degree of force required . . . is relative and depends upon the facts and particular circumstances of the case. It is not necessary that force be actually applied by the perpetrator to the victim." Commonwealth v. Williams, 439 A.2d 765, 768 (Pa. Super. 1982) (internal citations omitted).

The evidence presented at trial was sufficient to support the jury's finding that Appellant used forcible compulsion to facilitate indecent contact with each victim. All seven (7) of the above victims testified that Appellant was their psychiatrist who indecently contacted them in the context of the doctor-patient relationship. Each victim further testified that the indecent contact arose from Appellant's insistence on measuring each of their heart rates. Under the rouse of providing medical treatment, Appellant initiated indecent contact with each victim. Being as Appellant used the psychological and intellectual advantages inherent in his position as a licensed medical doctor to compel each victim to permit him to contact them in a manner that was against their will, the evidence was sufficient to find that Appellant's behavior amounted to forcible compulsion.

Coupled with this Court's above analysis establishing that Appellant initiated indecent contact with all seven (7) victims, the evidence presented at trial was sufficient to support the

25

jury's verdict that Appellant was guilty of seven (7) counts of Indecent Assault By Forcible Compulsion.

## C. Unlawful Contact with a Minor

A person is guilty of Unlawful Contact With a Minor if "he is intentionally in contact with a minor . . . for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth: (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses)." 18 Pa.C.S. § 6318. "The elements of this crime consist of intentionally, either directly or indirectly, contacting or communicating with a minor for the purpose of engaging in a sexual offense," specifically Indecent Assault. Commonwealth v. Morgan, 913 A.2d 906, 910 (Pa. Super. 2006). A minor is defined as any individual under the age of 18. 18 Pa.C.S. § 6318(c).

A.A. testified that at the time she treated with Appellant, she was 16-17 years of age. N.T. 10/08/14, p. 170. A.A. further testified that Appellant made her lie down on a couch as he reached underneath her shirt with his stethoscope. Appellant then touched in between her legs such that she could feel his hand touching her vagina over top of her leggings. N.T. 10/08/14, pp. 170-73.

Taken in light most favorable to the Commonwealth, this evidence is sufficient to find that Appellant engaged in unlawful contact with a minor. The evidence showed that A.A. was a minor at the time of the offense. The evidence further indicated that Appellant intentionally felt A.A.'s breasts underneath her shirt and touched her vagina overtop of her leggings. A.A.'s testimony was sufficient for the jury to find that such direct contact to A.A.'s sexual and intimate body parts was done intentionally and for the purpose of engaging in a sexual offense, specifically Indecent Assault. Lastly, as demonstrated through the above analysis, there was

26

likewise sufficient evidence to find that Appellant committed an Indecent Assault against A.A. As such, the evidence viewed in light most favorable to the Commonwealth as verdict winner was sufficient to support the imposition of a guilty verdict on the count of Unlawful Contact with a Minor.

### D. Corruption of Minors

18 Pa.C.S. § 6301(a)(1)(i) provides that a person "being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, . . . , commits a misdemeanor of the first degree." "Any actions that would offend the common sense of the community and the sense of decency, propriety, and morality which most people entertain, are actions that tend to corrupt the morals of a minor." Commonwealth v. Smith, 863 A.2d 1172, 1177 (Pa. Super. 2004).

Through her testimony, A.A. communicated to the jury that Appellant felt her breasts beneath her shirt and touched her vagina overtop of her pants. N.T. 10/08/14, pp. 170-73. By contacting a minor is such a sexual manner, there was sufficient evidence for the jury to find that Appellant's behavior is the type that "would offend the common sense of the community and the sense of decency, propriety, and morality which most people entertain." Therefore, viewed in light most favorable to the Commonwealth, there was sufficient evidence to support Appellant's guilty verdict on this count.

### II. Sentencing

Appellant asserts that the sentence imposed by this Court was excessive. At the outset, we note that no automatic right of appeal exists for a challenge to the discretionary aspects of sentencing. Rather, this type of appeal is more appropriately considered a petition for allowance of appeal. Commonwealth v. Rossetti, 863 A.2d 1185, 1193 (Pa. Super. 2004). Before reaching

the merits of a discretionary sentencing issue, a court must ascertain whether an appellant (i) filed a timely notice of appeal, (ii) properly preserved the issue to be heard on appeal, (iii) filed a brief free of fatal defects, and (iv) raised a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Commonwealth v. Mastromarino, 2 A.3d 581, 588 (Pa. Super. 2010).

A court evaluates whether a particular issue raises a substantial question on a case-by-case basis. Rossetti, 863 A.2d at 1193. "[The court] will grant an appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc).

When reviewing sentencing matters, great weight must be given to the sentencing court as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime. Commonwealth v. Fries, 523 A.2d 1134 (Pa. Super. 1987), allocator denied, 531 A.2d 427 (Pa. 1987). The well-settled standard of review for a claim challenging a discretionary aspect of sentencing is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived at a manifestly unreasonable decision.

Commonwealth v. Shugars, 894 A.2d 1270, 1275 (Pa. Super. 2006).

Appellant objects to his aggregate sentence of seven (7) to seventeen (17) years confinement as being excessive and unreasonable. This Court sentenced Appellant to serve two

and a half (2 1/2) to five (5) years confinement on Count 1, and nine (9) to twenty four (24) months on each Count 3, Count 7, Count 8, Count 9, Count 10, and Count 12. Appellant's sentences are to be served consecutively.[8] We will address each element of this sentence below.

## A. Sentence Imposed Within the Aggravated Range

Appellant objects to this Court's sentence of not less than two and a half (2 1/2) nor more than five (5) years confinement on Count 1, Unlawful Contact with a Minor.

When imposing a sentence, the trial court is required to consider the sentence ranges set forth in the Sentencing Guidelines. Commonwealth v. Yuhasz, 923 A.2d 1111, 1118 (Pa. 2007). However, the trial court may deviate from the recommended guidelines; they are "merely one factor among many that the court must consider in imposing a sentence." Yuhasz, 923 A.2d at 118. A court may depart from the guidelines "if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community." Commonwealth v. Eby, 784 A.2d 204, 206 (Pa. Super. 2001).

"The sentencing guidelines are merely advisory, and the sentencing court may sentence a defendant outside of the guidelines so long as it places its reasons for the deviation on the record." Commonwealth v. Mouzon, 828 A.2d 1126, 1128 (Pa. Super. 2003). When specifically reviewing a trial court's imposition of a sentence within the aggravated range, the Superior Court will examine three factors:

> First, a sentencing judge may consider any legal factor in deciding whether a defendant should be sentenced within the aggravated range. Second, in order to be adequate, the sentencing judge's reasons for sentencing within the aggravated range must reflect this consideration. Finally, the sentencing judge's decision regarding the aggravation of a sentence will not be disturbed absent a manifest abuse of discretion.

---

[8] This Court did not impose any further sentence on Counts 2, 4, 5, 6, 13, 14, 15, 16, 17, and 18.

Com. v. Duffy, 491 A.2d 230, 233 (Pa. Super. 1985) (citations omitted).

While this Court went beyond the standard range of the Guidelines in sentencing Appellant on Count 1, we submit that we have based Appellant's sentence on valid legal reasons and placed such reasons on the record, as required by Pennsylvania law. In fashioning Appellant's sentence, this Court considered the Sentencing Guidelines and the mitigating evidence presented by Appellant, among all other necessary factors. However, this Court was, and remains to be, troubled by the fact that Appellant used the position of trust afforded him by his medical license to manipulate and abuse those patients who came to him seeking treatment and aid. This Court was also troubled by the fact that, even after hearing the testimony and impact statements of his victims, Appellant still denied responsibility and essentially claimed he was only helping his patients. This Court gave the following explanation at Appellant's sentencing hearing:

> There's no doubt in my mind that you haven't accepted responsibility for this. You continue to deny it. Your remorse is for you and your family and not for these young women that you have manipulated and assaulted. And by your own words, you just can't bring yourself to tell them what happened and that you're sorry for -- you rationalize everything.

> And so when I look at the nature and background of the defendant, I have to look at the impact he has had upon the victims, and he continues to victimize them. He continues to look them in the eye and tell them he pretends to care about them, when we all know the only thing he cares about is getting out of jail. So I've taken all of those things into account.

> I've taken into account the multiple victims in the case, the fact that the defendant has exploited his position as a treating physician of these young women. In fact, he used his medical license to take advantage of them. He had yet another tool of his trade. They went to him for treatment, and they came out of his office as victims of a diabolical mind.

> I think there's even some suggestion . . . when I heard the trial testimony that they tried to get away and they couldn't. They felt like they couldn't get away but had to go back. They couldn't get their appointments with other physicians in less time so they felt like they had to go back to him. To me, that's something that

30

justifies an aggravation of the sentencing guidelines, although I'm not sure I feel that that's necessary on every count. But it certainly is an aggravation of what has happened in this case. They were desperate and they could only get help from one person, and that was their doctor. And as he so aptly put it, he was the only person they could go to.

[The] sentencing guidelines in this case recommend, on Count Number 1, three to 12 months in the standard range, and that's because the contact was with a minor. The sentencing guidelines on the misdemeanors of the first degree recommend a sentence of probation to nine months in the standard range, and 12 months in the aggravated range. So I've considered sentencing guidelines as well.

And the impact it's had upon the victims is immeasurable. As they said, their recovery has been delayed, if not backtracked. They have been victimized again; as I said, people who are fragile to begin with who need your help. And so the impact upon the community is such that I have to send, I think, a message to others like you, Doctor, that this type of conduct is not acceptable.

N.T. 02/09/15, pp. 54-57.

With respect to Appellant's sentence on Count 1 in particular, this Court further detailed:

. . . I might add that the sentence in this case is an aggravated sentence because I believe the victim's age is a factor. I don't believe the guidelines ever took into account a doctor-patient relationship, nor do they take into account the multiple victims in the case.

N.T. 02/09/15, pp. 59-60.

This Court considered several factors in our imposition of a sentence within the aggravated range of the sentencing guidelines on Count 1, and as evidenced during Appellant's Sentencing Hearing, this Court documented each factor on the record. As it is apparent from the record that this Court considered several legal factors, in addition to both the Guidelines and the mitigating evidence supplied by Appellant, we submit the sentence imposed was appropriate.

### B. Sentences Imposed Within the Standard Range

No substantial question exists as to the sentences imposed upon Appellant within the standard range of the sentencing guidelines. Therefore, Appellant's sentences on Counts 3, 7, 8, 9, 10, and 12 are not appealable issues. The standard range for each count of Indecent Assault is

31

probation to nine (9) months incarceration. This Court imposed a sentence of nine (9) to twenty four (24) months incarceration on each of six (6) counts. Even assuming Appellant's sentence is an appealable issue, this Court considered several legal factors when imposing sentence and placed those factors on the record.[9] We submit that the sentence imposed was appropriate and should be affirmed.

### C. Consecutive Sentences

The general rule in Pennsylvania is that a sentencing court has discretion in determining whether to run a sentence concurrently with or consecutively to other sentences being imposed. 42 Pa.C.S. 9721; Commonwealth v. Hoag, 665 A.2d 1212, 1214 (Pa. Super. 1995) (citations omitted). A challenge to a trial court's imposition of "consecutive rather than concurrent sentences, however, does not present a substantial question regarding the discretionary aspects of sentence" that is required to invoke the jurisdiction of the Superior Court. Id.

Appellant complains that his total sentence was excessive. It is important to note that each of these Counts of which Appellant was convicted arises out of her crimes against seven separate victims, each of whom specifically sought out Appellant for help, only to become victims. The imposition of consecutive sentences properly addresses the crimes Appellant committed against each victim. This Court's imposition of consecutive sentences was a valid exercise of our discretion, and our reasons for imposing Appellant's sentence are well-documented on the record.[10] As such, we submit that this Court did not abuse our discretion in imposing consecutive sentences for Appellant's crimes against his patients.

---

[9] This Court's findings, in pertinent part, are reproduced above.
[10] We again reference the findings this Court made at Appellant's Sentencing Hearing, produced above.

## CONCLUSION

For the foregoing reasons, this Court perceives that the issues of which Appellant has complained in this appeal are without merit, and that this Court's February 9, 2015 Judgment of Sentence and March 20, 2015 Denial of Motion to Reconsider Sentence were supported by both the law and the record in this case. We respectfully request the Superior Court affirm this Court's decision.

BY THE COURT:

June 26, 2015
Date

_____
WALLACE H. BATEMAN, JR. J.

Copies to:

Lindsay Vaughn, Esquire
District Attorney's Office
100 North Main Street
Doylestown, PA 18901


Burton Rose, Esquire
1731 Spring Garden Street
Philadelphia, PA 19130